# MAYNARD COOPER & GALE PC
ATTORNEYS AT LAW

The ~~~~ Court is Directed to:
— Doc. # ____ )
— Doc. and File As: ____

**Janell Ahnert**
DIRECT 205.254.1202
EMAIL jahnert@maynardcooper.com

May 8, 2013

**VIA FACSIMILE (212) 805-7991**
Hon. J. Paul Oetken, U.S. District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

The Clerk of Court is Directed to:
Term motion (doc. # ____ )
✓ Doc. and File As: Letter

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAY 16 2013

Iglesias v. Merrill Lynch, et al., Civil Action No. 12 Civ. 2053 (JPO) (MHD)

Dear Judge Oetken:

We represent Defendants in the above-referenced case. We write in response to Plaintiff's counsel's May 3 letter, regarding discovery disputes. This is a single-plaintiff case in which a current Merrill Lynch ("ML") Complex Director ("CD") claims: (a) that he was not awarded the Managing Director ("MD") title in 2010 because he is Hispanic; and (b) that he received less favorable performance reviews in 2011 and 2012 (and thus was ineligible for the MD title) in retaliation for filing his EEOC charge and lawsuit. Plaintiff has served **124** requests for production, and Defendants have produced over **3,600 documents**. Plaintiff has also deposed nine witnesses, including under Rule 30(b)(6). <u>Each and every remaining area of dispute is an instance of Plaintiff over-reaching, far beyond the bounds of permissible discovery</u>. No discovery should be compelled.

## BACKGROUND

In 1994, ML hired Plaintiff as a producing manager. He was later promoted to CD of the Stamford complex. During the time period at issue, ML measured the performance of CDs with ratings (Does Not Meet, Meets, Exceeds) in two areas — the "What" and the "How." The "What" is based on a set of metrics such as revenue and recruiting. Prior to 2012, ML "stack-ranked" the "What" performance of CDs, meaning CDs were scored on each metric and then ranked against each other. Since 2012, CDs' performance has instead been rated against the goals set in their complexes, not against the performance of other CDs. Plaintiff's objective "What" performance has been rated "Meets" in three of the four years since the system was first utilized in 2009. He has not asserted that any of his "What" ratings were discriminatory or retaliatory. CDs also earn a rating in the "How" category, which, simply put, measures the processes the CD has put into place and the CD's execution of those processes in order to improve his or her objective metrics.

Each year, the preliminary ratings of the CDs are compared at a calibration meeting for the division, and adjustments are made to ensure that Regional Managing Directors ("RMDs") who manage CDs are being consistent in how they award the ratings. In 2010, Lee Rusinek, Plaintiff's RMD, gave Plaintiff a preliminary rating of "Exceeds" on the "How" and nominated Plaintiff for the MD title. During the Northeast Division's calibration meeting, Plaintiff's "How" rating was lowered from "Exceeds" to "Meets" after he was compared to other CDs who had earned "Exceeds" ratings. Having heard the level at which the other "Exceeds" CDs had performed, Rusinek fully supported the change, which meant Plaintiff was no longer eligible for consideration for the MD title that year.

The MD title is a corporate title, not a job title. As such, it comes with no change in job duties. Further, it is undisputed that a CD who receives the title of MD experiences no change in eligible total compensation. In other words, Plaintiff concedes that he would not have received an increase in his total compensation if he had received the MD title. The MD title committee consists of individuals from different areas of ML's business who meet to determine which CDs (or managers in other lines of business) have earned the MD title, based on established criteria. It is undisputed in this case that CDs must have at least one "Exceeds" rating in the year to be nominated for the title. Many CDs who *are* nominated are still not selected for the title. In 2011 and 2012, Plaintiff received "Meets/Meets" ratings and thus was not eligible for the MD title.

## DOCUMENTS RELATING TO PATEL & MERAZ (2RFP #s. 9-15)

Among the disputed documents are ones regarding the employment of two other Hispanic employees: Patel, a current CD, and Meraz, a former MD. Plaintiff's letter to the Court posits that he has been intentionally discriminated against by not receiving the MD title because no Hispanic employee has achieved the title. However, Meraz was assigned the MD title in 2001, and promoted to RMD in 2005. Furthermore, documents relating to Meraz and Patel's employment

Page 2

with Defendants have no relationship to Plaintiff's claims in this matter. Plaintiff argues that the employment records of Meraz and Patel are discoverable, simply because they are Hispanic, like him. However, the authority Plaintiff cites for this preposterous contention is entirely inapplicable. By citing to cases involving the admissibility of so-called "me-too" evidence, Plaintiff ignores the fact that neither Patel nor Meraz has ever claimed to have experienced discrimination at the hands of ML. Indeed, the undersigned directly inquired whether Plaintiff's counsel had testimony (or a written statement) from Patel or Meraz to support "me too" allegations, and nothing was provided. The only basis for the requests is Plaintiff's personal, *entirely speculative* belief that Meraz was "singled out" when he applied for a RMD position and that Patel was unfairly "demoted."

Even if the requested documents *were* in the nature of actual "me too" evidence, it would not make them proper. The alleged employment decisions were not made by any decision-maker involved in the events underlying this case. The individual who hired someone besides Meraz to be the RMD for the Greater Los Angeles Region in 2008 was Greg Mech, who had no involvement in any employment decision that forms the basis of Plaintiff's claims. Likewise, Plaintiff testified only that he "heard" Patel had been demoted and had no facts to support his personal belief that she was discriminated against. In truth, Patel was transferred after the Detroit Metro Market was restructured. The Detroit Metro Market is managed by Paul Lambert, who was not involved in any of the decisions Plaintiff challenges in this lawsuit.

## RECRUITING DATA (2RFP #s 25-27)

Plaintiff also asks the Court to compel data regarding the number of Financial Advisors ("FAs") recruited by each CD in Plaintiff's Market/Region since 2010 and by all nominees and recipients of the MD title since 2010. The request is overbroad. FA recruiting is only one of the metrics that goes into the "What" rating. Thus, a CD may have a low metric in FA recruiting yet still earn an "Exceeds" rating in the "What" because he or she has excelled in other metrics. Moreover, the *process* a CD uses to be successful in FA recruiting is measured in the "How" rating, not by reference to the FA recruiting raw number. As discussed above, there is no claim in this case that Plaintiff's "What" rating during the relevant time period was discriminatory or retaliatory. And, notably, Defendants have produced a significant amount of data regarding the "What" metrics of CDs nationwide, including stack-ranking reports and Business Results Reports

Furthermore, FA recruiting data related to MD nominees or recipients is not the proper comparison. The MD Title Review Committee did not discuss Plaintiff's lack of FA recruits in 2010 because his nomination was withdrawn, and Plaintiff's FA recruiting results were not compared to other CDs by the Committee in 2011 or 2012 because Plaintiff was not nominated for the title in those years. As such, comparisons of Plaintiff's recruiting numbers to those individuals who *were* nominated and/or received the MD title are misplaced. To the extent that documents should be produced responsive to this request, the documents should be limited to individuals against whom Plaintiff's performance was actually compared. As discussed above, CDs' preliminary ratings are calibrated at the Division level. For this reason, Defendants have offered to produce information regarding the number of FAs recruited by each CD who was discussed at the 2010 calibration meeting, *i.e.*, the CDs against whom Plaintiff's performance was calibrated in 2010.

Relatedly, Plaintiff seeks data regarding attrition rates for individuals who were new to the FA role (and were enrolled in the Performance Management Development ("PMD") program). Plaintiff claims that Houston retaliated against him by rating him a "Meets/Meets" in 2012 is based on one comment during the review about Plaintiff's rate of attrition among his Complex's PMDs and the Complex's PMD program costs. In discovery Plaintiff specifically requested the production of a report titled "PMD Program Full Year/December 2012 Attrition." Setting aside the fact that a "meets/meets" rating (the same rating Plaintiff received in 2010) is not an actionable adverse action for a retaliation claim, Defendants produced the requested report for Plaintiff's market, which includes PMD attrition and program costs for all other CDs who were reviewed by Houston in 2012. This is the proper comparator set in this case. In his letter to the Court, Plaintiff claims that a 2012 MD title recipient had nearly the same PMD attrition rate as Plaintiff. First, that alleged fact is of no consequence as PMD attrition is but one of numerous areas upon which a CD is rated to determine a final overall rating (a CD can achieve an "Exceeds" with a low metric in one area if it is offset by other high metrics). Second, the criticism of Plaintiff was not just that he had a PMD attrition rate of 70%, but that the high attrition came with a *cost of over $953,000*. Finally, Houston rated Plaintiff's performance in 2012. Thus, the only relevant PMD attrition data is for other CDs rated by Houston in 2012 – which, again, Defendants have produced. Finally, the specific PMD attrition report at issue was first utilized in 2012. Data regarding PMD attrition prior to 2012 is not stored in a readily available report. In order to produce PMD attrition rates for all CDs nationwide over a four-year time period, Defendants would have to pull data from several sources and produce a report that does not exist. Because ML has already produced

the relevant responsive document to this request, and the additional data is not readily available, the demand is overly broad and unduly burdensome.

### DIVERSITY DATA (2RFP #s 21-22)

Defendants have produced over forty pages of documents related to their diversity efforts and initiatives. Defendants object to any further production because the goals and metrics sought bear no significant relationship to Plaintiff's claims. Specifically, Plaintiff contends that his discrimination claim is bolstered by the alleged fact that a small number of Hispanics have reached the level of CD or MD. Thus, the only relevant diversity goals and metrics would be those relating to the award of the CD or MD title to Hispanics. However, ML's diversity efforts are not specific to any one diverse group (but rather focus on people of color and women) or any particular corporate title (goals were not set for the MD title that is at issue in this case and testimony has established that diversity was not taken into consideration with regard to awarding this title). The diversity goals sought are plainly not pertinent to Plaintiff's claims here.

### COMPLEX GOALS AND PERFORMANCE EVALUATIONS (2RFP #s 32, 37, 38)

Defendants have produced over 75 performance reviews for 35 individuals alleged by Plaintiff to be comparators and decision-makers. In addition, in an effort to compromise on this issue and in a show of good faith, Defendants agreed to produce (and have produced), over their objections, performance reviews for all US Wealth Management CDs who were nominated for the MD title (not just those who actually received it). Only after this agreement was reached and the documents were produced did Plaintiff serve a second document request, seeking the production of all performance reviews for all CDs in his region/market — another 27 reviews for an additional 15 individuals. Despite Defendants' significant production (and offer to produce more relating to any specific situations), Plaintiff insists he is entitled to generally peruse various confidential aspects of the employment of approximately 15 more non-parties. Plaintiff has not articulated a legitimate purpose to be served by the proposed production, nor has his counsel cited any applicable law to support his position. These requests are unduly burdensome, invasive, and an impermissible fishing expedition. To the extent that any response is required from Defendants, that response should be limited to the potentially similarly situated comparators who Plaintiff could claim were evaluated preferentially. Those individuals are other CDs in Plaintiff's market who received an "Exceeds" rating from Rusinek/Houston in 2011/2012, which Defendants have offered to produce.

As for CD goals, as discussed above, CD complex goals were first utilized in 2012. Because Plaintiff is claiming that his 2012 "meets/meets" performance review (which was based on his 2012 goals) may be somehow retaliatory, the potentially similarly situated comparators who Plaintiff could claim were evaluated preferentially are other CDs in his market who received an "Exceeds" rating. As such, the proper production is the 2012 formulaic goals assigned to Plaintiff and the CDs in Plaintiff's market who received an "Exceeds" rating in 2012, which Defendants have offered to produce as a compromise.

### COMPENSATION DATA (2RFP # 46):

Plaintiff seeks the production of compensation (salary and incentive compensation) for every employee who was awarded the MD title since 2009, for a period of two years prior to receiving the title to present. Plaintiff asserts the data is necessary to establish whether the total eligible compensation of CDs changes upon receipt of the MD title, but *there is no dispute in this case as to that fact*. Virtually every witness, including Plaintiff, have been questioned about this subject and have agreed that total eligible compensation does not change. Nevertheless, Plaintiff asserts he is entitled to peruse highly confidential and sensitive compensation data regarding third-party high-level executives who are not involved in this litigation. Clearly, this sensitive information should not be compelled.

### CONCLUSION

In short, Defendants have more than satisfied their discovery burden in this case by providing extensive documents and information in response to hundreds of requests, some of which are stunningly far afield from the actual claims being litigated in this case. Plaintiff remains unsatisfied and refuses to compromise further. Rather than indulge Plaintiff's insatiable demands for documents, the bulk of which are unduly burdensome to Defendants and utterly irrelevant to Plaintiff's claims, we request that the Court adhere to established principles regarding the proper scope of discovery, require no further production, and deny Plaintiff's contemplated motion in its entirety.

05/08/2013 13:51 FAX 2052541999                                    005/005

Page 4

                                                Respectfully,

                                                Janell M. Ahnert
                                                Counsel for Defendants
                                                Merrill Lynch & Co., Inc., Merrill Lynch, Pierce,
                                                Fenner & Smith Inc., & Bank of America
                                                Corporation

cc:    Anne L. Clark, Esq.
        Gregory S. Chiarello, Esq.